JOURNAL ENTRY and OPINION
{¶ 1} Appellant R.J. Martin Electrical Contracting ("RJM") appeals the trial court's order granting summary judgment in favor of North American Wire ("NAW") officers Bradley K. Martin, President of NAW; Patrick DeMarco, Vice President of Finance and CFO of NAW; and Ray Wantage, Vice President of Operations of NAW; on its claim for officer fraud. RJM assigns the following error for our review:
 {¶ 2} "The trial court erred in granting defendants-appellees' motion for summary judgment on the issue of officer fraud."
 {¶ 3} Having reviewed the record and relevant law, we affirm the trial court's judgment. The apposite facts follow.
 {¶ 4} On February 11, 2002, RJM filed suit against NAW for failure to pay for electrical work performed at the NAW site in the amount of $290,978.48. The complaint also asserted causes of action for unjust enrichment and breach of contract. RJM filed an amended complaint on March 18, 2002, adding as parties NAW officers Bradley Martin, Patrick DeMarco and Ray Wantage. RJM alleged piercing the corporate veil and officer fraud against these individuals.[1]
 {¶ 5} The record indicates in 2000 and 2001, RJM was working as a subcontractor for Fortney Weygandt at NAW. In early 2001, Ray Wantage, NAW's Vice President of Operations, approached RJM about performing electrical work directly for NAW. Although RJM usually has customers sign a service contract, this was not done with NAW because RJM was being paid strictly on a time and materials basis.
 {¶ 6} NAW began experiencing financial difficulties in August 2001 because of a severe downturn in the fiberoptics and telecommunica-tions industries. NAW's revenue declined fiftypercent over the previous twelve months, which necessitated corporate layoffs and a five-percent across-the-board reduction in salary. NAW engaged in various efforts to obtain alternate financing. The impact of 9-11 on the economy further affected NAW's revenue.
 {¶ 7} NAW approached its primary lender, LaSalle Bank, about extending its credit line. It also applied for State and County loans and asked one of its manufacturers to delay seeking reimbursement for equipment that was causing delays and other problems. In their depositions, Bradley Martin and Patrick DeMarco stated that in spite of these financial problems, they remained optimistic that revenues would increase after the expansion project was completed. According to DeMarco, at that point NAW expected to market new equipment, which would generate a new stream of income.
 {¶ 8} In September 2001, due to unpaid invoices, Robert Martin, then President of RJM, and RJM's controller, Vince Romito, met with NAW officers Bradley Martin and Patrick DeMarco to discuss concerns regarding NAW's financial problems. According to Robert Martin, Bradley Martin and DeMarco admitted NAW was experiencing financial difficulties and advised him of NAW's efforts with LaSalle Bank and efforts to obtain funds from State and County loans. According to Martin, he did not think Bradley Martin and DeMarco were intentionally lying to him. He thought they actually believed NAW's financial future would be positive.
 {¶ 9} NAW received a $1 million loan from the State of Ohio in early October 2001. It used the loan money to pay down debts owed to creditors, including $40,000 to RJM. NAW did not receive the loan from the County. NAW offered to sign a promissory note in favor of RJM in November 2001 for the remaining unpaid invoices; but because the parties could not agree on the terms of the note, it was never executed. At the time NAW offered to enter into the promissory note, DeMarco was confident NAW would be able to pay the note.
 {¶ 10} RJM stopped work at the NAW facility in December 2001 due to NAW's failure to pay. NAW was forced to declare bankruptcy in early 2002. NAW ceased its operations, and its assets were sold.
 {¶ 11} Based on the above evidence, the trial court granted summary judgment in favor of RJM on its claim against NAW for unpaid debts in the amount of $290,978.48. The trial court, however, granted summary judgment in favor of the officers on RJM's officer fraud claim, finding:
 {¶ 12} "Defendants' Motion for Summary Judgment is granted as to the fifth cause of action, since [RJM] President Robert J. Martin by his own testimony admitted that the individual defendants Martin and DeMarco actually believed that the financial outlook was positive for North American Wire Products Corp. (Martin Deposition pp. 36-37). Further, Plaintiff is unable to point out any specific misrepresentations made by the individual defendants. As a result, there are no genuine issues of material fact, and defendants Martin, DeMarco and Wantage are entitled to summary judgment in their favor on the Fifth Cause of Action as a matter of law."[2]
 {¶ 13} RJM appeals and contends the trial court erred by entering summary judgment because there existed genuine issues of fact regarding whether the NAW officers committed fraud.
 {¶ 14} We consider an appeal from summary judgment under a de novo standard of review.[3] Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.[4] Under Civ.R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can only reach one conclusion which is adverse to the non-moving party.[5]
 {¶ 15} The moving party carries an initial burden of setting forth specific facts which demonstrate his or her entitlement to summary judgment.[6] If the movant fails to meet this burden, summary judgment is not appropriate; if the movant does meet this burden, summary judgment will only be appropriate if the non-movant fails to establish the existence of a genuine issue of material fact.[7]
 {¶ 16} A corporate officer may be held personally liable for corporate debts or contracts if he engages in fraud.[8] To hold a corporate officer liable for fraud, the plaintiff must show that: (1) the officer knew his statement to be false, (2) the officer intended the plaintiff to act upon it, and, (3) the plaintiff acted on the statement and, as a result, suffered injury.[9]
 {¶ 17} A review of the record indicates there is no evidence that any of the statements or representations made by the officers were fraudulent. When Robert Martin approached the officers regarding NAW's failure to pay, the officers truthfully told him that NAW was experiencing financial troubles and truthfully told him about their efforts to obtain more financing from LaSalle Bank and attempts to receive funds from County and State loans.
 {¶ 18} RJM contends the officers representing NAW's financial difficulties as temporary was fraudulent; however, there was no evidence presented that the officers did not believe the difficulties were temporary. It was not until August of 2001 that the economic problems at NAW became serious. DeMarco testified that as late as July 2001, NAW was able to pay its bills, but not within the normal thirty-day invoice time. According to DeMarco, NAW never paid its invoices within the thirty-day time during the fourteen years he worked there, but it was always able to make payments. Therefore, RJM's stating that NAW was having chronic financial problems is deceiving as bills were being paid, albeit untimely. According to DeMarco and Bradley Martin, the repercussions from the terrorist attacks on September 11, 2001, further hindered NAW's ability to recover from a sluggish economy.
 {¶ 19} The officers also testified they were very confident that once they were able to market the new equipment, it would generate significant sales and reinvigorate NAW's income stream. However, the new equipment did not operate properly and became an unsalable product. The fiberoptic industry also did not rebound as they anticipated. The ability to anticipate future revenue and the impact of a sluggish economy are difficult tasks. Apparently, these officers were optimistic that things would turn around for NAW. The fact that it did not, should not convert their subpar ability to assess NAW's future operating income into fraudulent intent.
 {¶ 20} Although Robert Martin claims Wantage advised him that money was set aside to pay for the electrical work at the time the agreement was made, there is no evidence that Wantage knew this statement was false. Wantage's deposition was never taken. Additionally, in his answer to RJM's interrogatory, he denied that he represented to RJM "during the period of January 1, 2000 to present" that NAW would be able to pay RJM for services and materials provided.[10] Also, in answering RJM's interrogatories, Wantage stated that to his knowledge NAW was paying its financial obligations when due "from January 1, 1997 throughout the date it filed for bankruptcy."[11] Robert Martin himself testified he had no knowledge that Wantage's statement was false. Therefore, there is no evidence that Wantage made this statement fraudulently. Accordingly, RJM's sole assigned error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Sweeney, J., and McMonagle, J., concur.
[1] RJM later voluntarily dismissed its claim for piercing the corporate veil.
[2] Journal Entry, October 27, 2003.
[3] Baiko v. Mays (2000), 140 Ohio App.3d 1, citing Smiddyv. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35; NortheastOhio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs. (1997),121 Ohio App.3d 188.
[4] Id. at 192, citing Brown v. Scioto Bd. of Commrs. (1993),87 Ohio App.3d 704.
[5] Temple v. Wean United, Inc. (1997), 50 Ohio St.2d 317,327.
[6] Dresher v. Burt, 75 Ohio St.3d 280, 292-293,1996-Ohio-107.
[7] Id. at 293.
[8] Yo-Can, Inc. v. The Yogurt Exch., Inc.149 Ohio App.3d 513, 2002-Ohio-5194.
[9] Centennial Ins. Co. v. Vic Tanny Internat'l (1975),46 Ohio App.2d 137, 141.
[10] Wantage Answer to Interrogatory No. 14.
[11] Wantage Answer to Interrogatory No. 11.